UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVE ELLIS KARACSON,

      Petitioner,                            Case No. 20-cv-13100
                                               Hon. Matthew F. Leitman

v.

DAVID SHAVER,

      Respondent.
_____/

## OPINION AND ORDER (1) DENYING PETITION FOR A WRIT OF HABEAS CORPUS (ECF Nos. 1, 7, 11), (2) GRANTING A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner Steve Ellis Karacson is a state prisoner incarcerated at the Central Michigan Correctional Facility in St. Louis, Michigan. On November 12, 2020, Karacson filed a *pro se* petition for a writ of habeas corpus in this Court seeking relief under 28 U.S.C. § 2254. (*See* Pet., ECF No. 1; Am. Pet., ECF No. 7; Resp., ECF No. 11.) Karacson seeks relief from his state-court convictions for arson of an insured dwelling, Mich. Comp. Laws § 750.76(1)(a), and insurance fraud, Mich. Comp. Laws § 500.4511. (*See id*.) A jury convicted Karacson of those charges following a trial in which he represented himself.

In these proceedings, Karacson challenges his convictions and sentence on a single ground. He contends that he was completely denied the right to the assistance

1

of counsel at trial and that prejudice should be presumed from that denial pursuant to the Supreme Court's decision in *Cronic v. United States*, 466 U.S. 648 (1984). Respondent counters that Karacson waived his right to counsel before the trial began and that he therefore has no claim for deprivation of his right to counsel. The Michigan Court of Appeals agreed with Respondent. While the question is a very close one, the Court concludes that the decision of the Michigan Court of Appeals was not contrary to, or an unreasonable application of, clearly established federal law. The Court will therefore **DENY** Karacson's petition. However, given the closeness of the question, the Court **GRANTS** Karacson a certificate of appealability and **GRANTS** him leave to appeal *in forma pauperis*.

## I

## A

Karacson's convictions arose from a fire that destroyed his home. The Michigan Court of Appeals summarized the facts underlying the convictions as follows:

> At about 8:20 p.m. on November 6, 2017, 911 received a call regarding a fire at defendant's house in Inkster, Michigan. When emergency personnel arrived, the house was fully engulfed in flames, and it took two to three hours to fully extinguish the fire. The police and defendant's homeowner's insurance company each launched investigations into the cause of the fire. Each independently concluded that the fire had multiple origin points, which was indicative of an intentionally set fire. They also each encountered an obvious smell of gasoline

2

throughout the remains of the house. The investigators ruled out the possibilities that the fire had occurred naturally, due to electrical issues or due to natural gas. Rather, they concluded that the fire had been deliberately set using gasoline as an accelerant.

The police and the insurance company's investigator also both interviewed defendant. Defendant denied storing any flammable liquids in his house. Defendant denied to both investigators that he had been in Michigan at the time of the fire. Defendant claimed he had left Michigan on November 4 with his dogs to take them to Kentucky. He claimed he returned to Michigan just after midnight on November 7—in other words, about four hours after the fire had started. Defendant claimed he did not find out about the fire until about 7:20 a.m. on November 7. Rather than checking on his house, defendant kept a scheduled appointment at 9:00 a.m. The person with whom defendant met testified that defendant told him that his house was on fire, but when the person suggested that defendant leave to check on his house, defendant stated that he thought the fire was a joke.

The police analyzed defendant's cell phone records. The records confirmed that defendant left Michigan on November 4, 2017, and that he arrived at Kentucky on November 5. However, on November 6, at 1:26 p.m., defendant's cell phone connected with a cellular tower in Dearborn, Michigan. From 2:00 p.m. until 6:47 p.m., his cell phone connected to a tower in Wyandotte, Michigan. Then, at 7:41 p.m., defendant's cell phone connected to a tower in Inkster, Michigan, where defendant lived. This connection occurred about 40 minutes before the onset of the fire. There were no further connections to any cellular telephone towers from that time until the next morning. Defendant was arrested on the basis of the discrepancy between his claimed location and his actual locations as revealed by the cell phone records.

When defendant was arrested, he was found to have on his person a receipt from a hardware store in Wyandotte, showing that he had purchased a five-gallon gasoline can and a pair of utility gloves on November 6, 2017, at 3:12 p.m. The manager of the store confirmed that she had sold the can and gloves to defendant at that time. The insurance company's investigator found a new, or nearly new, gasoline can outside defendant's house. The can still had liquid gasoline in it. A former tenant of defendant testified that she had offered to purchase defendant's house in September of 2017 for $20,000, which defendant rejected as inadequate. Defendant also told the tenant that he could get more money for the house from his insurance.

As will be discussed in more detail, defendant had a contentious relationship with his appointed trial attorneys, apparently based in part on defendant's desire for his attorneys to perform certain acts on his behalf and at his direction. At the beginning of trial, defendant requested another substitute counsel, which the trial court refused. Defendant elected to represent himself instead of proceeding with his appointed counsel, which the trial court permitted. Unfortunately, due to defendant's nescient command of legal concepts, legal procedure and rules, or logic, the trial court was required to interrupt defendant on several occasions to sustain objections or explain that defendant was not permitted to do something. Further complicating the proceedings, on the second day of trial, it was discovered that one of the jurors had made an improper remark presupposing defendant's guilt, which was overheard by three other jurors. After dismissing the juror who made the remark, interviewing all of the remaining jurors individually, and confirming that the three jurors who overheard the remark were not affected by the remark, the trial court denied a motion for a mistrial. Defendant was convicted and sentenced as described.

*People v. Karacson*, No. 346236, 2020 WL 908944, at ** 1-2 (Mich. Ct. App. Feb. 25, 2020) (unpublished) (per curiam).

The state trial court sentenced Karacson to a term of 7 years to 7 years and 1 day imprisonment for arson, and 1 to 4 years imprisonment for insurance fraud. Karacson then filed a direct appeal in the Michigan Court of Appeals.  Two different attorneys filed different appeal briefs on Karacson's behalf, and Karacson filed a p*ro se* Standard 4 brief.[1]  The briefs raised claims concerning: (1) the trial court's denial of Karacson's motion for directed verdict, (2) improper witness testimony, (3) the trial court's failure to declare a mistrial for an improper juror remark, (4) the trial court's deprivation of substitute counsel, (5) ineffective assistance of counsel, (6) sentencing error, (7) judicial misconduct, and (8) the statutory basis for conviction. The Michigan Court of Appeals rejected Karacson's arguments and affirmed his convictions and sentence. *See Karacson*, 2020 WL 908944, at ** 9-10.  The Court sets forth in detail the relevant portion of the Court of Appeals decision below.

Karacson then filed an application for leave to appeal in the Michigan Supreme Court.  That court denied the application on the basis it was "not persuaded that the questions presented should be reviewed by this Court."  *People v. Karacson*, 948 N.W.2d 559 (Mich. 2020).  The Michigan Supreme Court subsequently denied reconsideration. *See People v. Karacson*, 951 N.W.2d 896, 897 (Mich. 2020).

---

[1] "A Standard 4 brief is a *pro se* appellate brief filed by a defendant in Michigan court who wishes to raise claims his counsel refuses to raise on his behalf. Defendants are not required to file one and it is filed in addition to any briefing filed by counsel." *McKinney v. Horton*, 826 F. App'x 468, 473 n. 3 (6th Cir. 2020) (citing Mich. Admin. Order No. 2004-6).

**B**

On November 12, 2020, Karacson commenced this action by filing a "Petition for Protective Writ of Habeas Corpus" in this Court pursuant to *Pace v. DiGuglielmo*, 544 U.S. 508 (2005). (*See* Pet., ECF No. 1, PageID.1-2.)  On April 9, 2021, Karacson filed a second protective petition for a writ of habeas corpus. (*See* Am. Pet., ECF No. 7.)  In both the initial petition and the amended petition, Karacson sought a stay from this Court so that he could return to state court and file a motion for relief from judgment under Michigan Court Rule 6.500. (*See* Pet., ECF No. 1, PageID.4; Am. Pet., ECF No. 7, PageID.21.)  Karacson stated that in his post-conviction motion, he intended to raise claims of judicial bias, ineffective assistance of trial counsel, unconstitutional jury instructions, and ineffective assistance of appellate counsel. (*See id*.)  On May 17, 2021, the Court granted Karacson's request to hold his petition in abeyance while he pursued those state remedies. (*See* Order, ECF No. 8.)

Karacson then returned to the state trial court where he filed a motion for relief from judgment raising the following issues:

> I.    Jurisdictional defect—Did all in authority, when, in concert, they all agreed to "judgeshop" this case?
>
> II.   Invalid search warrant—Did the court err when they accepted a search warrants findings of fact, when upon further inspection, the police searched a cellphone that did not belong to the defendant and the information could not

have existed in this phone because it was issued "after" the
incident?

III.    Violation   of   due   process   before   pro   se
proceedings—An argument occurred right before picking
a jury. This argument was about motions not being
presented to the court and witnesses not being summoned.
Was due process violated?

IV.    Abuse of law, process, discretion and authority—
When all in authority, in concert, agreed to violate MCR
8.111(C)(1), was that an abuse of law, process, discretion
and authority?

(St. Ct. Mot., ECF No. 26-13, PageID.1026.)

The trial court denied the motion for relief from judgment on June 23, 2021.

(*See* St. Ct. Order, ECF No. 26-1.) Karacson did not appeal the trial court's decision

to the state appellate courts.

On September 1, 2021, Karacson returned to this Court and filed a "Motion

for Amendment of Stay of Writ of Habeas Corpus." (*See* Mot., ECF No. 9.) He

alleged in his motion that he had exhausted his state remedies and that he wanted

the Court to lift the stay in this case and allow him to proceed in federal court. (*See*

*id*., PageID.29.) Because Karacson did not give the Court enough information to

make a preliminary determination on the exhaustion issue, the Court denied his

motion for amendment of the stay without prejudice and ordered Karacson to clarify

the facts and describe the procedural history of his criminal case in greater detail.

(*See* Order, ECF No. 10.)

7

On March 22, 2022, Karacson filed a response to the Court's order in which he stated that he had filed a post-judgment motion under Michigan Court Rule 6.500, that the state trial court had denied the motion, and that he did not appeal the trial court's order. (*See* Resp., ECF No. 11, PageID.40.) He added that he did not intend to appeal from that order and that he wanted to Court to lift the stay and to review only a single habeas claim: whether, under *United States v. Cronic*, 466 U.S. 648 (1984), he was deprived of his Sixth Amendment right to counsel. (*See id.*, PageID.39-40.) Karacson said: "I present only 1 issue, which I ask the Court to scrutinize under the *U.S. v. Cronic* standard...." (*Id.*)

On April 11, 2022, the Court reopened the case for consideration of that single claim. (*See* Order, ECF No. 12, PageID.80.) On January 26, 2023, Respondent filed his Answer and the relevant state-court record. (*See* ECF Nos. 25, 26.).

The Court held a hearing on the petition on October 11, 2024.

## II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal courts to uphold state court adjudications on the merits unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

8

"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

### III

As noted above, the basic dispute in this habeas action is this: Karacson says that he was completely deprived of the right to counsel at his trial when the state trial court forced him to represent himself, while Respondent counters that Karacson freely, knowingly, and unequivocally waived his right to counsel.  The Court begins with the relevant facts, turns to the Michigan Court of Appeals' decision on the claim, and then explains why relief on the claim is precluded by AEDPA's demanding standard.

### A

Karacson ended up representing himself at trial because of breakdowns in his relationships with the two attorneys who were separately appointed to represent him. In June of 2018, roughly two months before trial, Karacson's first appointed attorney, James Parker of the Legal Aid & Defender Association, moved to withdraw as his attorney.  At a hearing on that motion, Parker told the state trial court that "from the very beginning Mr. Karacson and I could not see eye to eye or have any type of meaningful discussion about the facts of the case." (6-14-18 Hr'g Tr., ECF No. 26-4, PageID.301-302.)   Parker added that Karacson "has made numerous

requests at a particular court level, then he's written letters to the office, to the defenders office, and finally he has informed me he has filed a grievance against me." (*Id.*, PageID.302.)   Parker concluded by asking to "be withdrawn from this case." (*Id.*)  The trial court asked Karacson if he had any objection, and Karacson responded "No, I don't." (*Id.*)   The trial court then granted the motion. (*Id.*) Karacson asked the court to appoint the lawyer he "had before" Parker, and the court said that it would "look into" appointing that attorney.

On June 7, 2018, the trial court held a pre-trial conference to address the appointment of new counsel for Karacson.  A defense attorney named William Winters III appeared at the conference, and the court told Winters that it "wish[ed] to assign him" to represent Karacson. (6-7-18 Conf. Tr., ECF No. 26-5, PageID.307.) The court asked Winters if he had had an opportunity to discuss the case with Karacson, and Winters said that he had been able to speak "very briefly" with Karacson. (*Id.*)  The court then asked Winters if things with Karacson were "working out so far," and Winters responded that he saw "no reason it shouldn't work out." (*Id.*)  The court then appointed Winters to represent Karacson, set a "special pre-trial" for June 22, 2018, and set the case for trial on August 20, 2018. (*Id.*)

Karacson and Winters then appeared before the trial court on June 22, 2018, for the "special pretrial." (*See* 6-22-18 Conf. Tr., ECF No. 26-6.)   At that conference, Winters told the court that it was possible he would need to request an

adjournment of the trial date, and the court said that it would consider such a request, if made. (*See id*., PageID.313.)  Next, the prosecution placed on the record its scoring of the sentencing guidelines for Karacson's charged offenses and its plea offer to Karacson. (*See id*.).  Finally, Winters made a motion for a reduction in bond, and the court granted the motion. (*See id.*, PageID.314.)

Winters and Karacson again appeared before the trial court for another pre-trial conference on July 20, 2018.  During that conference, the prosecution told the trial court that it had extended a new plea offer to Karacson as a result of negotiations with Winters. (*See* 7-20-18 Conf. Tr., ECF No. 26-7, PageID.318.) The terms of that new offer were placed on the record, and Winters informed the court that Karacson had rejected the new proposal. (*See id.*, PageID.319.)  Winters then asked that the case be "kept on track" for the August 20, 2018, trial date. (*See id*.)  The trial court said that the case would be tried at that time. (*See id*.)  Finally, Winters told the court that "I know Mr. Karacson has a number of legal issues he wants to bring before the Court.  I will review those again and take appropriate action." (*Id*.)

Karacson and Winters appeared for trial as scheduled on August 20, 2018. When the court called the case, the prosecution again placed its most recent plea offer on the record, and Winters and Karacson both confirmed that Karacson

"rejected it previously and intends to reject it today." (8-20-18 Trial Tr., ECF No. 26-8, PageID.325.)

The trial court then said that Winters had informed it that Karacson "had expressed" an interest in representing himself at trial (*Id.*) The court had the following exchange with Karacson:

> THE COURT: And Mr. Winters advised me that you had expressed and had interest in representing yourself in this case?
>
> MR. KARACSON: Yes, sir.
>
> THE COURT: Is that still what you want to do?
>
> MR. KARACSON: I believe so at this time.

(*Id.*)

The trial court then warned Karacson of the risks associated with self-representation:

> THE COURT: Well, Mr. Karacson, let me remind you that you are charged in three counts. One of the counts is a life offense, arson of an insured dwelling. A very serious crime. The prosecutor has just indicated what the sentencing guidelines are. How old are you, sir?
>
> MR. KARACSON: Sixty years old.
>
> THE COURT: Sixty. Well, if you're convicted of a life offense, I don't need to tell you what the realities of – of your future. But you're really taking a great risk in trying to represent yourself.

You know, we – we don't – we can't change the rules of engagement with somebody who's a non lawyer.

In other words, you know, the rules about picking the jury, for example, there are a lot of rules. There is the issue of excuses for cause or for peremptory challenges. There -- there's a lot of rules that go into that. And then once you get into the trial, rules about opening statements, rules about cross-examining witnesses.

I would expect anybody who's representing themselves is going to have to follow those rules. And it might mean I have to, you know, be on top of you constantly, which I'd rather not do.

But if you insist on representing yourself, you just must know that you're facing some very serious charges here, including a life offense.

And you're going to have to follow the rules.

Karacson responded, "Yes, sir." (*Id.*, PageID.327.) The court then had the following exchange with Karacson:

THE COURT: Are you sure you want to do that [represent yourself]?

MR. KARACSON: Yes.

(*Id.*)

Then, even though Karacson had indicated that he did wish to represent himself, the trial court asked him if he wanted to represent himself "in the jury selection process." (*Id.*) The transcript indicates that Karacson's response was "(Silence)." (*Id.*) In the face of Karacson's silence, the trial court told Karacson

that it would appoint stand-by counsel to "answer any questions" that Karacson may have during jury selection. (*Id.*) The court then told Karacson that he (Karacson) had "some time to think about" whether he wished to represent himself during jury selection because the selection would not begin until after a lunch break. (*See id.*) The court told Karacson that he could "make a final decision" about whether to represent himself during jury selection "when we come back" from the lunch break. (*Id.*, PageID.327-328.) Karacson then asked if he could "have a moment" with Winters to discuss the matter, and the court said that he could "talk to [Winters] all you'd like" during the lunch break. (*Id.*, PageID.328.)

As soon as the court resumed proceedings after the lunch break, Karacson asked to personally address the court. (*See id.*, PageID.334.) He told the court that he was "requesting a new attorney" because he was not "seeing eye to eye" with Winters. (*Id.*) Karacson also informed the court that he had filed a grievance against Winters on August 1, 2018. (*See id.*)

Next, Karacson told the trial court that "didn't know trial was going to start today." (*Id.*) He made that assertion even though the trial date had been stated on the record in his presence at the two earlier pre-trial conferences.

The following colloquy then took place:

> MR. KARACSON: *** I'm not prepared to move forward. I haven't seen an investigator for the evidence I was asking for. It's being withheld. I'm requesting a full discovery. And I'm requesting a new attorney.

THE COURT: Well, Mr. Karacson, earlier today you said you wanted to represent yourself.

MR. KARACSON: Right. I need help with my case, your Honor. I'm not getting it.

THE COURT: Well, this is not a very good time to be asking for a new attorney. I'm not going to grant your request for a new attorney now. We have a jury panel waiting in the hallway. Earlier today you said you wanted to represent yourself, which, of course, is your right. Mr. Winters, anything you want to say about discovery and then some of the other issues Mr. Karacson just raised?

MR. WINTERS: Thank you, your Honor. I would like to be heard. This is, certainly, no personal reflection about Mr. Karacson. However, I'm going to join in his motion. There seems to be some real clear disagreements with regard to the conduct of this case. I know Mr. Karacson has motions that he wants the court to address and I'm not going to go into the confidential privileged communications that we've had. I think it's going to be in his best interest, I really do, your Honor, that he either get another attorney, or allow him an opportunity to go over all this discovery.

Now, most of its has been provided to him.

THE COURT: When you say an opportunity, is he – you provided him with the discovery that you have?

MR. WINTERS: Yes. But there's been supplemental discovery along the way and Ms. Baker has always provided me and forwarded to me.

There's a number of different issues about cell phone towers and locations.  There's a number of evidentiary issues. There's a theory of the case that Mr. Karacson wants to go into that just frankly, you know, I can't be in a position where I'm going to assist to his wishes and --

15

and have him – I just don't want to go down the road -- road that he and I – or that he's proposing.

I think it's in his best interest and the Court's best interest, too, as well as the prosecution, that he gets a lawyer that he is comfortable with.  I – I have nothing further here.

THE COURT: All right. Well, he's in custody and this matter has been adjourned once already.  I don't know.  Do the People have anything they want to say about this?

MS. BAKER: Well, a few things I want to say.  With respect to the supplemental discovery.  The cell phone records have always – have been in the discovery since the beginning.  The only thing we received new, actually, is just the mapping that was done by the expert.  But the cell phone records were there.  He just put his map together, which is his demonstrative that he plans on using in the case.

And other than that – and then I did give him a disc that just has some pictures.  But we have two experts in this case.  He already has the pictures of the expert from EFI Global. And then I have just pictures from the – the actual fire department from Westland.  They were on a zip drive just given to me.

But, again, the – the report was there.  So that's pretty much it.  Everything else has actually been in discovery from the beginning.

I will also have to say that this defendant has indicated -- he indicated at exam, he had motions, he had an attorney at that time.  Same thing.  He said he didn't like that attorney and they didn't see eye to eye.

Honestly, I don't think he's going to see eye to eye with any attorney. But –

THE COURT: (Interposing) Probably not. Well, motions, you know, as far as motions go, Mr. Karacson, you could

16

have filed those yourself.  If you thought you had – I mean, I don't know what motions you think you have in mind and I don't even know if you even understand which motions the Court can entertain.

But neither of your two lawyers that you've had have filed any motions and – and, perhaps, wisely so.  If you had thought you had something to file, I mean, you could have filed it yourself.

MR. KARACSON: I tried.

THE COURT: So – anyway.  There's no motions on the table now, as far as I know.

MR. WINTERS: If I might be heard and I think you heard Mr. Karacson say that he tried.  And he has given me copies of the proposed motions that he'd like to address before the Court.  I understand he didn't want the previous lawyer.

THE COURT: I don't have any motions.

MR. WINTERS: Well, they're going to –

THE COURT: (Interposing) I don't have any.

MR. WINTERS: That's why he –

THE COURT: (Interposing) Have they been filed on line?

MR. WINTERS: No.

THE COURT: Well, okay.

MR. WINTERS: And that's why he's asking for an additional opportunity to file those motions, adjourn the matter so that these motions can be heard.

THE COURT: So just click them off.  What are they motions for?

MR. WINTERS: Well, one he wants a cause and origin expert with regard to the fire itself. He wants an expert with regard to cell phone tower analysis. He's challenging the arrest warrant. The search warrant affidavit. He's got -- he's asking for a -- a number of evidentiary issues that, you know, frankly I just -- I don't know whether these are going to be pertinent. But he's got a number of witnesses that he wants to call. And – and...

THE COURT: He doesn't have to file a motion for that.

MR. WINTERS: No. That is true. But he's going to ask the court's assistance to secure their presence.

THE COURT: Well, all right. He should have done that a long time ago.

MR. WINTERS: And if that's the case, I don't know if you should blame him. Blame his counsel who's been on this case since about June.

THE COURT: Okay.

MR. WINTERS: And I've tried to –

THE COURT: (Interposing) That's very nice of you to fall on your sword, Mr. Winters, for Mr. Karacson, but I think we're all stuck with each other.

I'm not adjourning the trial. Mr. – if Mr. Karacson wants to go it alone, he can do that. I still want you here as standby counsel. And we're not going to entertain any motions that haven't been filed or aren't before the court.

So – all right. Let's bring the panel in. We'll pick a jury and try the case.

(*Id.*, PageID.336-340.) The matter then proceeded to jury selection with

Winters remaining as stand-by counsel.

Karacson re-affirmed his waiver of his right to counsel at several later points in this trial.  For instance, on the second day of trial, the trial court repeated its warnings about self-representation, told Karacson that he could re-evaluate his decision to represent himself, and sought to confirm that Karacson still wished to represent himself. (8-21-18 Trial Tr., ECF No. 26-9, PageID.600-601.)  In response, Karacson did not ask for a lawyer.  Instead, he said "yes, sir," and continued to represent himself. (*Id.*)  Next, at the beginning of the third day of trial, the trial court again raised the issue of self-representation, warned Karacson that he was facing serious charges, told Karacson that he "would benefit from legal counsel," and asked Karacson if he was "certain" that he wanted to continue representing himself. (6-22-18 Trial Tr., ECF No. 26-10, PageID.671.)  Karacson said, "yes, sir," and again continued representing himself. (*Id.*)  Finally, before closing arguments, the trial court cautioned Karacson about the rules that he would have to follow and the limitations on his arguments, and the court again asked Karacson if he was "sure" that he wanted to give his own closing argument. (8-23-18 Trial Tr., ECF No. 26-11, PageID.914-916.)   Shortly thereafter, Karacson gave his closing argument. (*See id.*, PageID.949-958.)

As noted above, at the conclusion of the trial, Karacson was convicted on all of the charges.

**B**

On direct appeal, Karacson argued that the trial court violated his Sixth Amendment right to the effective assistance of counsel "BY FORCING HIM TO PROCEED PRO SE AFTER [HE] STATED ON THE RECORD THAT HE WANTED TO BE REPRESENTED BY APPOINTED COUNSEL AND DID NOT WAIVE HIS RIGHTS." (*See* Standard 4 Brief, ECF No. 26-14, PageID.1154.)  The Michigan Court of Appeals addressed this claim on the merits and rejected it.  That court concluded that Karacson waived his right to counsel and thus had no claim for deprivation of that right:

> In his supplemental brief on appeal and in his Standard 4 brief, defendant argues that he was deprived of his right to counsel because the trial court refused to permit defendant to obtain substitute counsel on the morning of the first day of trial and instead permitted defendant to represent himself. We disagree.

> This argument turns on a combination of two different concepts: the right to substitute appointed counsel, and the right to self-representation. We review for an abuse of discretion a trial court's decision whether to permit a defendant to represent himself and whether to grant a substitution of counsel. *People v. Hicks*, 259 Mich. App. 518, 521; 675 N.W.2d 599 (2003); *People v. Strickland*, 293 Mich. App. 393, 397; 810 N.W.2d 660 (2011). As a general matter, we review underlying factual findings for clear error. See *People v. Williams*, 470 Mich. 634, 640-641; 683 N.W.2d 597 (2004). Whether a defendant's waiver of the right to counsel is "knowing" and "intelligent" is reviewed de novo. *Id.*

An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced. Appointment of a substitute counsel is warranted only upon a showing of good cause *and* where substitution will not unreasonably disrupt the judicial process. [*People v. Mack*, 190 Mich. App. 7, 14; 475 N.W.2d 830 (1991) (emphasis added).]

Defendants have a limited right to discharge counsel during a trial. *People v. Henley*, 382 Mich. 143, 148; 169 N.W.2d 299 (1969). "Good cause" to obtain substitute counsel may exist "where a *legitimate* difference of opinion develops between a defendant and his appointed counsel with regard to a fundamental trial tactic." *Mack*, 190 Mich. App. at 14 (emphasis added). However, "decisions about defense strategy, including what evidence to present and what arguments to make, are matters of trial strategy, and disagreements with regard to trial strategy or professional judgment do not warrant appointment of substitute counsel." *Strickland*, 293 Mich. App. at 398 (footnotes omitted).

It is clear from the record that the alleged breakdown in defendant's relationship with his trial counsel arose out of defendant's misapprehension that he had a right to direct appointed counsel to perform whatever acts he wished or conduct his trial in whatever way he deemed fit. See *People v. LaMarr*, 1 Mich. App. 389, 393; 136 N.W.2d 708 (1965). Appointed counsel declined to file a number of motions on defendant's behalf that, although counsel did not use such language, counsel clearly believed to be meritless or frivolous. Appointed counsel also clearly believed that defendant's theory of the case was untenable, which, based on the bewildering conspiracy theory defendant pursued, was likely a reasonable conclusion. Defendant and his appointed counsel undoubtedly had a difference of opinion as to trial strategy. However, because that difference of opinion was clearly as to whether counsel should engage in unethical, frivolous, or

meritless conduct, it cannot be a legitimate difference of opinion. See *People v. Mitchell*, 454 Mich. 145, 163-164; 560 N.W.2d 600 (1997). We are also not persuaded that the trial court erred in concluding that a substitution of counsel on the morning of trial would unreasonably disrupt the judicial process. Consequently, defendant has not established that he was entitled to the appointment of substitute counsel.

Defendant affirmatively requested of the trial court that he be permitted to represent himself. The trial court warned defendant that he was facing a life offense and that defendant would be required to comply with the same procedural and substantive rules as an attorney. The trial court further warned defendant that although it would "rather not," if defendant represented himself, the court might have to "be on top of [him] constantly." The trial court gave defendant an opportunity to ponder the implications and consult with his trial counsel. Ultimately, the trial court gave defendant a choice between acting as his own attorney with his appointed counsel as backup, or proceeding with his appointed counsel.

The trial court was required to establish that defendant's request to represent himself was unequivocal; that defendant was aware of the dangers he faced by acting as his own attorney; and that defendant's request was knowing, intelligent, and voluntary. *See People v. Russell*, 471 Mich. 182, 190; 684 N.W.2d 745 (2004). Before allowing a defendant to represent himself, a court must establish that the defendant was sufficiently competent in general to make the choice knowingly, intelligently, and "with eyes open." *People v. Dennany*, 445 Mich. 412, 432; 519 N.W.2d 128 (1994). In contrast, the defendant's legal competence is irrelevant. *Id*. Here, the trial court clearly made these determinations properly. The trial court recognized that defendant would pose some challenge to its duty to ensure that the procedural and substantive rules were followed during the trial, but it was clearly willing to accept that burden. *See id*. The trial court's advice to

22

defendant substantially complied with MCR 6.005(D)(1), and the opportunity it gave defendant to consult with counsel substantially complied with MCR 6.005(D)(2). *See Russell*, 471 Mich. at 190-192 (rejecting a "litany approach" in favor of "substantial compliance" for the court rule so long as the defendant's waiver of counsel otherwise satisfies the constitutional requirements of being unequivocal, knowing, intelligent, voluntary, and not unduly disruptive). Therefore, the trial court did not abuse its discretion by allowing defendant to represent himself, and we reject defendant's contention that his self-representation was involuntary.

*Karacson*, 2020 WL 908944, at ** 5-6 (internal footnote omitted).

## C

"The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." *Faretta v. California*, 422 U.S. 806, 807 (1975). In *United States v. Cronic, supra*, the Supreme Court held that where there is a "complete denial" of a defendant's right to counsel in a trial that results in the defendant's conviction, then prejudice is presumed, and the defendant is entitled to relief form his conviction. *Cronic*, 466 U.S. at 658-59. Here, Karacson says that the Michigan Court of Appeals unreasonably concluded that he was not entitled to relief under *Cronic*.

The Michigan Court of Appeals did not directly rule on Karacson's *Cronic* arguments because, as noted above, it determined that he had waived his right to counsel. If Karacson did waive his right to counsel, then his *Cronic* claim

23

necessarily fails.  Thus, the question before the Court is whether the Michigan Court of Appeals' determination that Karacson waived his right to counsel was unreasonable under clearly established federal law.  The Court concludes that the Michigan Court of Appeals' determination that Karacson validly waived his right to counsel was not unreasonable.

**1**

In addition to guaranteeing that a criminal defendant has the right to counsel, the Sixth Amendment also "grants to the accused personally the right to make his defense." *Faretta*, 422 U.S. at 819.  But "before a defendant may exercise his right to self-representation, he must 'knowingly and intelligently' waive his right to counsel, which is the case only if he is 'aware of the dangers and disadvantages of self-representation.'"  *Pouncy v. Palmer*, 846 F.3d 144, 160 (6th Cir. 2017) (quoting *Faretta*, 422 U.S. at 835).   In addition, a defendant's waiver of his right to counsel must be "voluntary." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004).  Finally, "'[p]resuming waiver [of the right to counsel] from a silent record is impermissible.'" *Ayers v. Hall*, 900 F.3d 829, 835 (6th Cir. 2018) (quoting *Carnley v. Cochran*, 369 U.S. 506, 516 (1962)). Instead, "'[t]he record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.'" *Id.* (quoting *Carnley*, 369 U.S. at 516).

Karacson contends that the Michigan Court of Appeals unreasonably applied these clearly established rules in two respects. First, he contends that that court unreasonably concluded that he actually did waive his right to counsel. Second, in the alternative, he contends that even if that court reasonably concluded that he did waive his right to counsel, the court unreasonably concluded that the waiver was voluntary. For the reasons explained below, the Court disagrees.

**2**

It was not unreasonable for the Michigan Court of Appeals to conclude, based on a review of the *entire* record, that Karacson intended to waive, and did waive, his right to counsel. *See King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006) (holding that it is a reasonable application of clearly established federal law for a state court "to look at the whole record, not just the colloquy immediately before the [offering] of the waiver," when assessing whether a defendant made a valid waiver of the right to counsel). The record contains several indications that Karacson rejected the assistance of counsel and sought to represent himself. For instance, before the trial began, the trial court warned Karacson about the dangers of representing himself and asked him if he was "sure [he] want[ed]" to do so, and his answer was an unqualified, "yes." (8-20-18 Trial Tr., ECF No. 26-8, PageID.327.) Likewise, as described in detail above in section (III)(A), at several other points during the trial, the trial court warned Karacson of the dangers of self-representation, and Karacson's statements

25

and actions in response repeatedly re-confirmed that he wished to proceed on his own.  Finally, the Michigan Court of Appeals could reasonably have concluded that Karacson's inability to work with his two appointed attorneys and his repeated requests for new appointed counsel also supported its finding that he did waive his right to counsel. See *United States v. Green*, 388 F.3d 918, 922 (6th Cir. 2004) (holding that the defendant's "persistent, unreasonable demand for dismissal of counsel and appointment of new counsel functioned as a valid waiver of the right to counsel.")  For all of these reasons, the Court cannot conclude that it was unreasonable for the Michigan Court of Appeals to determine that Karacson did waive his right to counsel.

While the Court cannot find the Michigan Court of Appeals decision to be unreasonable, the Court does acknowledge that there is substantial room for fair disagreement with that court's ruling.  Indeed, if this case were before this Court on *de novo* review, this Court may well have come out differently on the waiver issue. The Court is particularly concerned about the gap in the trial court's initial proceedings to determine whether Karacson intended to waive his right to counsel. More specifically, as set forth in detail above, immediately after Karacson answered "yes" to the trial court's question of whether he wished to represent himself, he expressed uncertainty as to whether he wished to represent himself during jury selection, and he asked for an additional opportunity to discuss the matter with his

attorney. (8-20-18 Trial Tr., ECF No. 26-8, PageID.327-328.)  The trial court then said that Karacson could do so and could make a "final decision" about representing himself during jury selection after consulting with his attorney, and the court took a break. (*Id.*)  But when the trial court later re-called the case, it seemed to proceed from the premise that Karacson had already made the final decision to represent himself during jury selection, and the court did not undertake a clear inquiry to follow up on Karacson's expressed uncertainty. (*See id.*, PageID.334-340.)  This gap in the waiver proceedings gives the Court pause and raises reasonable questions about whether Karacson offered a clear and unequivocal waiver of his right to counsel during the critical phase of jury selection.  However, under AEDPA, those reasonable questions are not enough to disturb the state court's ruling to the contrary.

### 3

Karacson has also failed to show that the Michigan Court of Appeals unreasonably concluded that his waiver of his right to counsel was voluntary.  He contends that his waiver was involuntary because was forced to choose between (1) being represented by counsel who would not file his preferred motions and who, he claims, failed to take certain steps in preparing for trial and (2) no representation at

all.  He calls this a "Hobson's choice."[2]   But he has failed to satisfy the Sixth Circuit's standard for invalidating a waiver of counsel under this theory.

In *Pouncy*, *supra*, the Sixth Circuit explained what a habeas petitioner would have to show to invalidate a waiver of counsel on a Hobson's choice theory:

> [W]e have previously interpreted the basic teaching of *Iowa v. Tovar*, 541 U.S. 77, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004), *Faretta*, and *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)—that the voluntariness of a waiver is measured by reference to the surrounding circumstances—as clearly establishing the principle that "the choice between unprepared counsel and self-representation is no choice at all." *James*, 470 F.3d at 644 (quoting *Fowler v. Collins*, 253 F.3d 244, 249–50 (6th Cir. 2001) ) (applying 28 U.S.C. § 2254(d) ). But even if *Tovar*, *Faretta*, and *Johnson* "clearly establis[h]" the "Hobson's choice" principle that Pouncy invokes on appeal, Pouncy faces an uphill battle in showing that no proper application of those holdings could lead to the conclusion that Pouncy voluntarily waived his right to counsel.
>
> Not only does Pouncy, as a habeas petitioner, bear the ultimate burden of proving that his waiver of counsel was involuntary, *see Glass v. Pineda*, 635 F. App'x. 207, 214 (6th Cir. 2015); *Akins v. Easterling*, 648 F.3d 380, 395 (6th Cir. 2011), but also those habeas courts that have applied

---

[2] The term "Hobson's choice" originated in England in the early 1600s, where a man named Thomas Hobson worked as a licensed carrier. Hobson kept horses to carry goods between Cambridge and London and rented them to university students. Students had their favorite horses. In an effort to prevent those horses from being overworked, Hobson used a rotation system which gave each customer the choice of taking the horse closest to the stable door or no horse at all. This method became known as Hobson's choice. *See* Hobson's Choice, MERRIAM-WEBSTER (last visited Nov. 18, 2024), https://www.merriam-webster.com/dictionary/Hobson's choice.

> the principle *that "a choice between proceeding with incompetent counsel or no counsel is . . . no choice at all" have emphasized that to succeed on such a claim, a petitioner must prove that appointed counsel was actually incompetent.* Wilks, 627 F.2d at 36. Doing so is no easy task.

*Pouncy*, 846 F.3d at 161 (emphasis added).  *Pouncy* makes clear that in order to invalidate a conviction on a Hobson's choice theory, a petitioner must show that his trial counsel was actually incompetent.

Karacson has made no such showing.  Moreover, the record seems to reflect that Karacson's trial counsel disagreed with Karacson's strategic view of the case, not that they were incompetent.  And there is at least some evidence that Winters was competent.  He prevailed on a motion to modify Karacson's bond before trial began.  Finally (and perhaps most importantly), the Michigan Court of Appeals rejected Karacson's claim that his attorney(s) provided ineffective assistance of counsel, *see Karacson*, 2020 WL 908944, at ** 6-7, and he no longer challenges that ruling in these proceedings.  For all of these reasons, Karacson has failed to show that either of his attorneys were actually incompetent such that his waiver of his right to counsel was involuntary under the *Pouncy* standard described above.

**4**

Because Karacson has not shown that the Michigan Court of Appeals unreasonably applied clearly established federal law when it determined that he validly waived his right to counsel, he is not entitled to relief on his claim that he

was deprived of the effective assistance of counsel. The Court will therefore deny his petition for a writ of habeas corpus.

## IV

In order to appeal the Court's decision, Karacson must obtain a certificate of appealability. To obtain a certificate of appealability, a petitioner must make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *See Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

The Court **GRANTS** Karacson a certificate of appealability because jurists of reason could debate the Court's conclusion that Karacson failed to demonstrate an entitlement to habeas relief.

The Court also **GRANTS** Karacson leave to appeal *in forma pauperis* because an appeal could be taken in good faith.

**V**

For all of the reasons explained above, **IT IS ORDERED** that the Karacson's

Petition for a Writ of Habeas Corpus (ECF Nos. 1, 7, 11) is **DENIED WITH**

**PREJUDICE**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is

**GRANTED**.

**IT IS FURTHER ORDERED** leave to appeal *in forma pauperis* is

**GRANTED.**

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 26, 2024

I hereby certify that a copy of the foregoing document was served upon the
parties and/or counsel of record on November 26, 2024, by electronic means and/or
ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126